**SO ORDERED.**

**SIGNED this 21 day of November, 2007.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| RANDY S. FLAMING, | ) | Case No. 05-13512 |
| TERESA L. FLAMING, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| ALVA STATE BANK & TRUST COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adversary No. 05-5890 |
| | ) | |
| RANDY S. FLAMING, | ) | |
| TERESA L. FLAMING, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION

**Nature of Case**

-1-

Plaintiff Alva State Bank & Trust Co. (ASB) seeks to except the debt of the debtors, Randy and Teresa Flaming, from their discharge. The debt arises from a $5.5 million loan made by ASB to the Flamings' business, Winnco Capital Corporation in March of 2000 and guaranteed by the Flamings. ASB seeks to except this debt from their discharge under a group of theories ranging from fraud and false pretenses under § 523(a)(2)(A), fraud via a written financial statement under § 523(a)(2)(B), and fiduciary defalcation under § 523(a)(4) to a general objection to their discharge for failing to keep records under § 727(a)(3) and a failure to explain loss to the property of the estate under § 727(a)(5).[1] Trial was held on ASB's discharge claims on September 5, 2007. ASB appeared by its counsel Timothy J. King. Debtors appeared by their counsel Edward J. Nazar.

**Jurisdiction**

The Court has jurisdiction of this core adversary proceeding under 28 U.S.C. § 157(b)(1) and (b)(2)(I) and (J). Because this case was filed prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, the Code as it was in force prior to October 17, 2005 governs the disposition of the case.

**Factual Background**

The story starts in 2000 when Randy Flaming ("Flaming"), the owner and operator of several companies that operated Sav-A-Trip convenience stores and sold and transported motor fuels to dealers and retailers, sought to purchase the assets of Winnco, Inc. ("Winnco").[2] Winnco was a highly successful wholesale fuel distribution company located in Oklahoma with numerous lucrative

---

[1] Except as otherwise noted, all statutory references are to Title 11, U.S.C. § 101 *et seq.*

[2] Flaming had been a corporate officer and minority shareholder of Sav-A-Trip for approximately sixteen years. He acquired the majority interest (from his father) of Sav-A-Trip in 1999.

-2-

motor fuel supply contracts. Winnco's operation consisted of Winnco, which sold the fuel, and W&W Transports, Inc. ("W&W"), which delivered the fuel sold by Winnco to customers. Flaming approached ASB to finance the acquisition of the Winnco operation and, after performing its due diligence, ASB agreed. As the acquisition was structured, Flaming formed Winnco Capital Corporation ("WCC") to be the new holding company of Winnco and W&W.

On March 9, 2000, WCC executed a promissory note in the amount of $5.5 million in favor of ASB. The loan was to be repaid in monthly instalments of $55,784.66 over fifteen years at an annually adjusted rate of interest, with a balloon payment due on the maturity date of March 15, 2015. As security for repayment of the note, Winnco and W&W granted a security interest in all of their personal property, including accounts receivable. The note was also secured by the guaranties of Randy and Theresa Flaming, as well as the guaranties of Winnco and W&W. As part of this acquisition, SATBHAG Holdings, L.L.C. infused capital of $400,000, acquiring the Winnco real estate and improvements in Weatherford, Oklahoma, and granted a mortgage on them to ASB. SATBHAG was one of Flaming's other existing entities and wholly owned by him.

Flaming's banker was Lee Brandt, president of ASB. Brandt and several of his bank directors traveled to Belle Plaine, Kansas as part of the due diligence process. There, Brandt viewed the office operations of Flaming's other ventures, loosely referred to herein as Sav-A-Trip, and evaluated the Flamings' ability to conduct the Winnco businesses. Sav-A-Trip was a chain of convenience stores in Kansas and Oklahoma that Flaming had operated, succeeding his father. Under the Sav-A-Trip banner were also businesses such as Harvest Enterprises, Inc. (convenience store and real estate), SATBHAG, Inc. (owner and lessor of Sav-A-Trip stores' real estate) and RSF

Capital Corp. (another owner of convenience stores real estate and fuel distribution contracts).[3] Another Flaming entity, Sav-A-Trip, Inc., (an operating company) owned or controlled Brews, Ltd and River City Petromarts, LLC. Flaming's accountant John Marstall explained at trial that the reason for there being so many entities was that Flamings acquired them at different times and in different formats. In any event, during the Belle Plaine visit, Brandt says that he made it clear to Flaming that ASB expected Flaming to run Winnco separately from Sav-A-Trip and the related holdings. There was not to be any commingling of cash or assets among the two sets of companies. Flaming also remembers conversation to this effect.

Although this was an important point to ASB, nowhere in any of the documents memorializing this transaction does any such negative covenant appear. Indeed, the parties did not enter into a loan agreement per se; all of the memorialized obligations of the parties are found in the note, guaranties, security agreements and mortgage signed by them.

Shortly after the loan was closed and the Flamings took over Winnco's operations, Winnco began to transfer funds to various Sav-A-Trip entities.[4] In the last four months of 2000 alone, Winnco advanced $1.035 million to Sav-A-Trip.[5] Brandt testified that ASB had no knowledge of these transfers as they occurred. Winnco did not maintain a depository relationship with ASB, continuing instead to bank with Winnco's old bank, the Bank of Hydro. Surprisingly, these transfers did not affect Winnco's financial performance, not least because, when the Flamings acquired the

---

[3] *See* Plaintiff's Ex. A – corporate chart for Flaming's Sav-A-Trip operations and entities.

[4] For ease of reference, the various Flaming entities and Sav-A-Trip operations are collectively referred to as Sav-A-Trip.

[5] *See* Plaintiff's Ex. H – summary of transfers. Ex. H does not take into account repayments made by Sav-A-Trip back to Winnco.

-4-

Winnco operation, it had a substantial cash surplus. Indeed, in the wholesale fuel business, such surpluses are necessary. Wholesalers buy fuel in bulk from producers who, in turn, issue drafts on the wholesaler's accounts. Those drafts may be issued the same day as delivery of fuel is taken. At the same time, the wholesaler will have sold the product to retailers, but may experience a collection lag of more than ten days. Thus, a cash cushion is always critical to the successful operation of a wholesale fuel business. Dishonor of a draft can constitute a basis for cancellation of a fuel supply contract, a potentially fatal result for wholesalers.[6]

Brandt testified that maintenance of a $2 million cash surplus was a very important concern of ASB. Yet, it does not appear from viewing Winnco's operating statements that a $2 million surplus ever existed after May of 2000. Indeed, Brandt stated that any concerns he might have had were alleviated by Winnco's showing of monthly profits in excess of $200,000 and timely loan payments.

As part of Winnco's arrangement with the ASB, Winnco provided ASB with very cursory financial reporting. This reporting consisted of (1) copies of tax returns as they were filed and (2) monthly financial statements. These statements were compiled by a public accountant who had done Winnco's books before the acquisition. All that was supplied to ASB was a copy of the balance sheet for the preceding month-end and an income statement. Reflected as assets on the balance sheet were two kinds of accounts receivable, those from "customers" and those from "others."[7] It is undisputed that ASB never made inquiry of Flaming concerning the line item "accounts receivable

---

[6] Flaming testified that while his Sav-A-Trip operations had two operating lines of credit, Winnco did not have an operating line of credit. Sav-A-Trip maxed out on its operating lines in 2003.

[7] *See e.g.,* Plaintiff's Ex. I, p. 079.

-5-

– others." Winnco possessed far more detailed financial statements and records. At trial, Flaming produced thousands of pages of financial records, consisting of monthly-produced sets of balance sheet, income statement, trial balance, general ledger, and transaction listings. Review of the complete financial records for each month shows that among the "others" accounts receivable reported on the balance sheet were the Sav-A-Trip entities who had received advances from Winnco.[8] ASB never received these more detailed financial records and statements because, as witnesses for both sides agree, it never requested them. Had it done so, and had the bankers reviewed these more complete statements, they would have discovered numerous advances to and repayments by the Sav-A-Trip entities.

Reviewing the statements also reveals that the "$2 million surplus" upon which Brandt says ASB relied does not appear to have existed at anytime from the month the loan closed until the business itself closed. While substantial cash levels were maintained for several years, they never reached $2 million. This information was available from the truncated statements ASB received, but it does not seem to have altered ASB's course.

From August 30, 2000 to January 24, 2003, Winnco "advanced" at least $4.764 million to the Sav-A-Trip entities.[9] According to Flaming, the Sav-A-Trip entities repaid a substantial but undetermined amount of these advances. The purpose of the advances was to assist Sav-A-Trip and its related entities in paying for their own fuel purchases due to cash flow problems. Sav-A-Trip's independent accountant who prepared the Sav-A-Trip tax returns testified that he treated the inter-

---

[8] *See e.g.,* Trial Ex. 122, pp. 3732, 3736.

[9] *See* Ex. H. At trial the advance from Winnco to Sav-A-Trip on December 28, 2000 in the amount of $250,000 was corrected to $115,000 per the backup document for the transfers summary, thus reducing the total on ASB's summary. *See* Ex. H, bates #036.

-6-

company transfers for tax purposes as inter-company receivables/payables. He also indicated that a company's cash flow statement, a financial statement not required by ASB, would show inter-company transfers.

This conduct continued until Flaming voluntarily approached ASB in February of 2003 and advised Brandt and the ASB board of directors that Winnco was having severe cash flow problems and an inability to cover fuel drafts. It appears that Flaming was forthcoming in his reporting of the situation to ASB and that he cooperated fully in assisting ASB's efforts to minimize its losses, including pledging additional collateral (title to all of the rolling stock) to ASB.[10] At this time, there was no discussion between ASB and Flaming of WCC or Winnco going into bankruptcy. According to Flaming, ASB and he mutually agreed to work through the financial difficulties with a possible merger or sale of assets to preserve Winnco's fuel contracts. Indeed, up to 2003, ASB made a series of short term loans (unsecured) to Winnco and continued to believe its financial health was fine.[11] Throughout their relationship, Brandt considered that there was no need to inquire beyond the monthly statements ASB received because he was comfortable with the positive cash flow reporting he received each month. Most telling, Brandt testified that he had no concern about any of the documentation he received from Flaming before making the loan.

---

[10] It is undisputed, however, that Flaming did not disclose the transfers out of Winnco when he met with the ASB Board. Immediately after meeting with ASB, Flaming did open Winnco books up to ASB and an outside accountant and it was at this point that ASB discovered the transfers on Winnco's books.

[11] Flaming testified that he procured these additional extensions of credit for Winnco by making a phone call to ASB. He was not required to complete a loan application or provide other documents beyond the monthly financial statements that were being provided to ASB. ASB did not inquire about the $2 million cash cushion that Winnco was supposed to maintain. It is not apparent from the record that ASB made any of these short term loans after Flaming contacted ASB in February 2003.

Flaming testified that the wholesale fuel business is characterized by significant cash flow, wildly variable product cost, and very thin margins. Indeed, he stated that after the terrorist attacks of September 11, 2001, his inventory costs increased by $1 million *in one day*. As inventory costs rise, wholesalers under contract to sell product at a certain price are squeezed as their profit margin is reduced. They are also squeezed on cash flow as noted above when their vendors draft their accounts for product payment but their receivables are not collected on the same cycle. According to both Flaming and Brandt, the Winnco business was well-run and extremely viable when Flaming acquired it. Flaming had considerable experience in this business as a result of his lifetime of work for Sav-A-Trip.

Flaming relies in part on the testimony of Ruth Parcell, their controller at Sav-A-Trip, who prepared a cash reconciliation document, Exhibit 19, in order to calculate the net balance of the advances and repayments.[12] This exhibit was prepared in 2004 or 2005 and is somewhat difficult to understand. It purports to strike a balance between what Sav-A-Trip "did" for Winnco and how much money Winnco wired in to Sav-A-Trip versus how much Sav-A-Trip wired out to Winnco. If the reconciliation is reliable, Winnco wired $8.479 million to Sav-A-Trip and Sav-A-Trip repaid Winnco $6.053 million, leaving a sizeable "deficit" in repayment of these advances. Parcell also testified that Sav-A-Trip performed overhead tasks for Winnco and shared administrators with it. Her reconciliation reflects allocations of Sav-A-Trip overhead to Winnco of about $1.4 million. ASB was not aware of this overhead allocation, but it was certainly aware that Winnco and Sav-A-Trip shared owners, managers, and back-office functions.

---

[12] Parcell testified that she prepared Exhibit 19 using Sav-A-Trip source documents such as bank statements and the general ledger.

Case 05-05890   Doc# 57   Filed 11/21/07   Page 8 of 18

Neither of ASB's two witnesses could point to a particular misrepresentation or falsehood uttered by Flaming. They concede they did not ask for financial information beyond what they received over the life of the loan, nor do they contend that any of the preliminary financial information they received was false or misleading. Their case is based primarily on their perception that Flaming had duties to refrain from making inter-company transfers and, if he did so, to inform ASB accordingly. In addition, they allege that ASB told Flaming that it considered Winnco to be separate from Sav-A-Trip and that the affairs of the two companies were to remain separate.

**Analysis and Conclusions of Law**

ASB filed a wide-ranging complaint challenging not only the dischargeability of the Flamings' guaranty debt, but also objecting to their general discharges under several subsections of § 727(a). ASB's legal theories may be summarized as follows. First, it alleges that the Flamings' guaranty debts were incurred by fraud, misrepresentation or false pretense as provided by § 523(a)(2)(A). Second, it asserts that the "incomplete" financial statements represent false written statements concerning Winnco's financial condition that would support excepting the Flamings' debt from discharge under § 523(a)(2)(B). Third, ASB asserts that the Flamings' participation in the transfer of funds from Winnco to Sav-A-Trip amounts to a defalcation while the Flamings were in a fiduciary relationship with ASB under § 523(a)(4). Finally, ASB argues that the Flamings concealed or failed to maintain financial records from which their financial condition could be ascertained as provided by § 727(a)(3) and that they failed to satisfactorily explain their loss of assets under § 727(a)(5). The Court considers these theories seriatim.

**Section 523(a)(2)(A) - Fraud Other than Statement of Financial Condition**

Perhaps the most potent of ASB's theories is that the Flamings obtained their debt to ASB

by false pretenses, misrepresentations or actual fraud. ASB essentially argues that by omitting to advise it of the ongoing inter-company transfers, the debtors committed fraud. To make its case on this count, ASB must show by a preponderance of the evidence that the debtor made a misrepresentation with the intent to deceive the creditor and that the creditor justifiably relied on the misrepresentation.[13] Omissions may amount to misrepresentations in the appropriate context.[14] The debtors' fraudulent intent may be inferred from the totality of the circumstances.[15] The parties here agree that Oklahoma law governs the fraud claim.[16]

The Court is simply not persuaded that ASB has demonstrated either the requisite intent of the debtors or the requisite reliance of the creditor.[17] As noted above, ASB had no complaints with the loan application or documentation provided by the Flamings for ASB's evaluation in determining whether to make the WCC acquisition loan. ASB presented no evidence of a false representation uttered by Flaming. ASB received all the financial reporting for which it asked after the loan was made. It was very satisfied with what it received because, as its president stated at trial, Winnco continued to make money until virtually the very end and was meeting its loan repayment

---

[13] *Grogan v. Garner*, 498 U.S. 279, 287 (1991) (preponderance standard); *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir. 1996) (Section 523(a)(2)(A) elements);

[14] *See In re Young, supra*; *Lang v. Lang (In re Lang)*, 293 B.R. 501, 513 (10th Cir. 2003) (Omission of a material fact when there is a duty to disclose, for the purpose of inducing action by another party, may constitute fraud under Utah law).

[15] *In re Young, supra.*

[16] *In re Lang,* 293 B.R. at 513 (10th Cir. 2003) (state law controls whether debtor has liability in fraud while bankruptcy law controls the dischargeability of debt).

[17] *Bellco First Federal Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997) (Exceptions to discharge are narrowly construed and doubts are resolved in debtor's favor.).

-10-

obligations.

The Court is particularly skeptical about ASB's position because it received financial statements that would have raised some question, at least in the Court's mind, about the ever-growing "accounts receivable-other" category on the balance sheet. Likewise, ASB did not question Winnco's failure to ever maintain the $2 million cash surplus. Moreover, a loan transaction of this size is generally outlined by a loan agreement that contains numerous negative covenants prohibiting or heavily conditioning inter-company transfers and the taking of dividends. Given ASB's awareness of Flaming's Sav-A-Trip operations, its complaint about the failure to keep Winnco segregated from Sav-A-Trip rings somewhat hollow without such loan agreement protections in place. If segregation was an important condition to induce ASB to make the loan, the Court would expect that condition to be reduced to writing.[18]

Likewise, this is not a case where the debtors took steps to conceal the inter-company transfers. Nor can it be said that Winnco omitted the inter-company transfers from its financial reports. Indeed, the transfers were included in the line item "accounts receivable - other" on the balance sheet. While the detail of those inter-company transfers was not apparent from looking at the balance sheet alone, it was evident in Winnco's other financial records (*i.e.* general ledger) and tied to the trial balance. ASB never questioned what this balance sheet entry consisted of or sought to distinguish it from the customer accounts receivable. As noted by the Sav-A-Trip accountant, these inter-company transfers would have been readily apparent had ASB requested a monthly cash

---

[18] *See In re Lang, supra* at 514 (The false pretenses or representations must "give rise to the debt."). Here, the inter-company transfers did not occur until after the debt was incurred. Thus, in these circumstances it is difficult to see how Winnco's purported "omission" or non-disclosure gave rise to the debt in question.

-11-

flow statement. In an enterprise so highly sensitive to cash flow, the Court is somewhat bewildered that ASB did not require monthly cash flow statements from Winnco as part of its monthly financial reporting obligations.

The Court also observes that the Flamings do not appear to have materially benefitted in any way from these inter-company transfers – at least there was no proof of that offered. Sav-A-Trip and its related entities were chapter 11 debtors in this judicial district and division in 2003 and were ultimately liquidated. These companies, initially owned or acquired by his father, had afforded Flaming employment for most of his life. He was a high school graduate operating businesses that grossed millions of dollars each month in a business that is highly competitive and price-sensitive. There is no evidence whatever that the Flamings harbored any ill intent toward ASB or that they engaged in any fraud or artifice. It appears to the Court that they told ASB what they were asked, provided the financial reporting requested of them, were forthcoming in times of trouble, and assisted when Winnco's fortunes waned.

The Court concludes that ASB has not met its burden of proof on the § 523(a)(2)(A) elements.

**Section 523(a)(2)(B) – False Written Statement of Financial Condition**

Section 523(a)(2)(B) is distinguishable from a § 523(a)(2)(A) claim in that the former covers a claim based on a false statement (in writing) of financial condition.[19] In order to find a debt nondischargeable under this section, the Court must find that the *debt was obtained by* : (1) using a statement in writing; (2) that is materially false; (3) respecting the debtor's . . . financial condition; (4) on which the creditor reasonably relied; and (5) that the debtors caused to be made or published

---

[19] *Cadwell v. Joelson (In re Joelson),* 307 B.R. 689 (10th Cir. BAP 2004).

-12-

with the intent to deceive.[20]  A statement of financial condition is a statement of a *debtor's* net worth, overall financial health or ability to generate income.[21]  To satisfy the writing requirement, the statement of financial condition must have been written by the debtor, signed by the debtor, or written by someone else but adopted and used by the debtor.[22]  The reliance element also differs between § 523(a)(2)(B) and § 523(a)(2)(A).  For § 523(a)(2)(B), a creditor must show that its reliance on the false written statement of financial condition was reasonable, a more stringent standard than the justifiable reliance standard of § 523(a)(2)(A).[23]

With respect to this claim ASB apparently relies upon its contention that the monthly financial statements provided to it as part of Winnco's monthly reporting obligation are materially false because the inter-company transfers were not disclosed thereon.  This position is problematic for several reasons.  One, these monthly financial statements were not those of the debtor.  Rather, they were Winnco financial statements.  There was no evidence that the Flamings prepared these monthly financial statements, signed them, or otherwise adopted them.  Two, the monthly financial statements were supplied to ASB *after* the credit was extended so it cannot be said that they induced ASB to make the acquisition loan to WCC.  Reliance on the monthly financial statement for ASB's extension of the credit is thus lacking.  Three, ASB has not shown that the monthly financial statements were materially false.  As the evidence established at trial, the "accounts receivable - others" line item on the monthly balance sheet included the inter-company transfers.

---

[20] § 523(a)(2)(B); *In re Kaspar,* 125 F.3d at 1359.

[21] *In re Joelson*, 307 B.R. at 696.

[22] *In re Kaspar, supra* at 1361.

[23] *See Field v. Mans*, 516 U.S. 59, 74-75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

-13-

To the extent ASB claims that documentation provided by Flaming prior to inception of the acquisition loan forms the basis for the § 523(a)(2)(B) claim, ASB does not identify what that writing is. No evidence was presented by ASB showing that the *Flamings*' financial condition was falsely presented in writing. Indeed, ASB admitted at trial through Mr. Brandt's testimony that it had no quarrel with any of the written information it received at the outset of the WCC credit. There is no evidence that Flaming submitted a materially false loan application or any other documentation to ASB for its evaluation in determining whether to make the loan and take personal guaranties from the Flamings.

ASB took issue with the monthly financial statements provided by Winnco during the administration and monitoring of the loan. The Court questions as a matter of law whether a creditor may base an attack on a guarantor's discharge on purported false financial statements of a non-debtor company when, as it appears here, the debtors are not directly implicated in the preparation of the statements and the statements are not shown to be materially false. Even had these statements been demonstrated to be misleading, the Court further questions whether the Bank's reliance on them was reasonable. Again, even cursory review would have revealed a large and growing category of non-trade receivables that could have elicited inquiry from a vigilant loan officer. Instead, Mr. Brandt testified that he primarily relied on the fact that Winnco continued to show positive income. Thus neither reasonable, nor actual reliance is shown here.[24]

---

[24] *See Rural Enterprises of Oklahoma, Inc. v. Watson (In re Watson),* 2003 WL 21241702 at *4, 294 B.R. 198 [Table] (10th Cir. BAP 2003) (In addressing omission of prior guaranty obligation from debtor's personal financial statement and reliance element, the court stated: "Therefore, Rural must show that it reasonably relied on the financial statement in agreeing to extend the Loan and not just, after the fact, argue that the financial statement, with its omission of the Legacy Guaranties, induced Rural to make the loan.").

ASB failed to carry its burden of proof on the § 523(a)(2)(B) claim.

**Section 523(a)(4) – Fiduciary Defalcation**

This subsection excepts from a debtor's discharge debts incurred by defalcation or fraud while acting in a fiduciary capacity. ASB argues strenuously that the Flamings were its fiduciaries. In order to demonstrate that fiduciary capacity, though, ASB must show some formal trust relationship between the parties – something more than a mere lender-borrower relationship. Moreover, this fiduciary relationship must have existed "prior to the creation of the debt in controversy."[25] As explained in *In re Johnson*:

> A debt created while acting in a fiduciary capacity is a special debt, created by a breach of trust obligations defined by law, and is separate and distinct from any underlying contractual debt which arises from a bankrupt's agreement with respect to goods or services.[26]

*Fowler Bros. v. Young (In re Young)* is the leading Tenth Circuit decision on this discharge exception.[27] It instructs as follows:

> The existence of a fiduciary relationship under § 523(a)(4) is determined under federal law. [citations omitted]. However, state law is relevant to this inquiry. [citations omitted]. Under this circuit's federal bankruptcy case law, to find that a fiduciary relationship existed under § 523(a)(4), the court must find that the money or property on which the debt at issue was based was entrusted to the debtor. *See Allen v. Romero (In re Romero)*, 535 F.2d 618, 621 (10th Cir. 1976) (interpreting "fiduciary capacity" as used in § 17(a)(4) of the Bankruptcy Act, § 523(a)(4)'s predecessor, to require a relationship "of trust or confidence, which . . . arises whenever one's property is placed in the custody of another"); *Van De Water v. Van De Water (In re Van De Water),* 180 B.R. 283, 289-90 (Bankr. D. N.M. 1995)

---

[25] *See Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1372 (10th Cir. 1996) (quoting *Allen v. Romero (In re Romero)*, 535 F.2d 618, 621 (10th Cir. 1976)).

[26] *Carlisle Cashway, Inc. v. Johnson (In re Johnson),* 691 F.2d 249, 251 (6th Cir. 1992) (applying the fiduciary fraud discharge exception under former § 17(a)(4) of the Bankruptcy Act).

[27] 91 F.3d 1367 (10th Cir. 1996).

Case 05-05890    Doc# 57    Filed 11/21/07    Page 15 of 18

(explaining that in cases where discharge has been denied under § 523(a)(4) for breach of fiduciary obligations, "the debtor had been entrusted with property of another and then abused that trust"). Thus, an express or technical trust must be present for a fiduciary relationship to exist under § 523(a)(4). [citations omitted]. Neither a general fiduciary duty of confidence, trust, loyalty, and good faith, *see In re Evans,* 161 B.R. at 477, nor an inequality between the parties' knowledge or bargaining power, *see In re Klippel,* 183 B.R. at 260, is sufficient to establish a fiduciary relationship for purposes of dischargeability.[28]

Here, there is no showing that the Flamings were in any kind of express or technical trust relationship with ASB or that it entrusted them with its property. While ASB had a legitimate business interest in Winnco's cash position being preserved, it had no legal interest in Winnco's cash flow beyond its security interest in Winnco's accounts. The existence of the security interest alone does not raise a fiduciary duty upon which an exception to discharge can be based in the absence of an express trust. Moreover, no relationship existed at all between Flamings and ASB prior to the Flamings' execution of the guaranty. Thus, no fiduciary relationship existed prior to the creation of the debt in controversy.

The relationship between the Flamings and ASB is nothing more than one of debtor-creditor. Under Oklahoma law, this is insufficient by itself to create a fiduciary relationship.[29] ASB has proven no facts or special circumstances that would bring its relationship with the Flamings outside

---

[28] *Id.* at 1371-72.

[29] *See Beshara v. Southern Nat. Bank*, 928 P.2d 280 (Okla. 1996) (The relationship between a bank and its depositor is generally considered contractual; depositor could not point to any facts to show that a special relationship existed with bank.); *First Nat'l Bank & Trust Co. of Vinita v. Kissee*, 859 P.2d 502, 510-11 (Okla. 1993) (Oklahoma recognizes the common law rule that the relationship between a bank and its customer is not fiduciary in nature, but is that of creditor-debtor.). *See also First Nat. Bank in Durant v. Honey Creek Entertainment Corp.,* 54 P.3d 100 (Okla 2002) (Lender-bank was in a debtor-creditor relationship with guarantor and owed no duty to guarantor to monitor the loan collateral for the benefit of the guarantor or to preserve the value of the borrower's assets).

-16-

this general rule.

In the absence of a fiduciary relationship between the Flamings and ASB, the fiduciary defalcation count under § 523(a)(4) must fail.

### **Section 727(a) Objections to Discharge**

ASB's general objections to the Flamings' discharges are based on their alleged failure to keep records under § 727(a)(3) and their inability to explain a loss of their assets under § 727(a)(5). Both of these fail, not least because there was no evidence offered concerning either the state of the *debtors'* records or their loss of assets.

It appears that both of these claims are predicated on perceived errors or omissions in Winnco's financial records and Winnco's loss of assets. At trial, the Flamings introduced several thousand pages of financial records of Winnco and W&W, including the source financial records (*i.e.* general ledger, trial balance, payroll ledger, bank statements) used for preparation of the monthly balance sheet and income statement provided to ASB. ASB pointed to no errors or omissions in them and did not question their completeness or accuracy. Similarly, ASB did not show that the Flamings could not explain the Winnco's losses. It was and is apparent that the failure of the Sav-A-Trip entities dragged Winnco down because of the cash drain Sav-A-Trip caused.

In order to make a prima facie case under § 727(a)(3), the creditor must show that the debtor "failed to maintain and preserve adequate records and that the failure made it impossible to ascertain his financial condition and material business transactions."[30] Only if ASB makes this prima facie case does the burden shift to the Flamings to justify the failure to maintain records. ASB falls

---

[30] *Gullickson v. Brown (In re Brown),* 108 F.3d 1290, 1295 (10th Cir. 1997).

-17-

woefully short in making a prima facie case under § 727(a)(3).[31]

As for § 727(a)(5), once a creditor establishes that a loss of assets has occurred, the burden then shifts to the debtor to explain the loss or deficiency of assets in a satisfactory manner.[32] Not only did debtors satisfactorily explain Winnco's loss of assets, the Court found Flaming to be extremely forthright in describing what transpired.

ASB has not proven either of the § 727(a) general objections to discharge.

**Conclusion**

Judgment should be entered for the defendants on the plaintiff's complaint, each party to bear their respective costs. A Judgment on Decision shall issue this day.

# # #

---

[31] The evidence at trial established that when Flaming approached ASB in February 2003 to inform it of Winnco's cash flow difficulties and ASB came into the Winnco business to review the books, it quickly found the inter-company transfers from Winnco to Sav-A-Trip in Winnco's financial records.

[32] *The Cadle Company v. Stewart (In re Stewart)*, 263 B.R. 608 (10th Cir. BAP 2001).

-18-